IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Candice Tucker,

        Plaintiff,

        vs.                     Case No. 13-2574-JTM

Aramark Corporation,

        Defendant.

MEMORANDUM AND ORDER

Plaintiff Candice Tucker alleges that she was subject to unlawful retaliation when she was disciplined and terminated from her employment with Aramark Corporation after she reported an incident of sexual harassment. Aramark has moved for summary judgment. For the reasons provided herein, the defendant's motion is denied.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon

mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### Findings of Fact

Aramark Food Service Director Erin Milek hired Tucker on October 8, 2012, to work as a Kitchen Supervisor at the Benedictine College cafeteria. Although Tucker had worked for Aramark at other locations, this was the first time she had worked in a higher-education setting.

The fact that Tucker had worked for Aramark on and off for ten years was one of the reasons Milek hired her, and why she was paid so well. Within Tucker's personnel file is a document dated October 9, 2012, signed by Tucker, including a certification that she received, read, and understood Aramark's Sexual Harassment Policy.

Aramark's Employee Handbook includes policies on progressive discipline and Aramark's Business Conduct Policy. That policy is not mandatory, and does not state when managers must create documentation of discipline. Aramark's progressive discipline policy states,

It is Aramark's practice generally to advise employees of performance or disciplinary issues and provide them the opportunity to correct the issue. However, Aramark reserves the right to deviate from this general practice at any time and at its sole discretion and with or without advance notice — for example, due to the severity of the offense, the circumstances under which it occurred, and the employee's duties.

A part of the Employee Handbook is the Location Guide for Benedictine College, and sets forth additional policies just for the Benedictine College account. The Location Guide provides:

In most cases, Aramark follows a four step discipline process: verbal counseling; written warning; final written warning; termination. Please keep in mind that Aramark has no obligation to use any one or more of these steps of discipline prior to discharging an employee. Any or all of these steps can be omitted, as Aramark deems appropriate, in its sole discretion.

Tucker was supervised by Chef Manager Yancy Kamine, and by Kamine's supervisor Milek.

Tucker contends that she was not explicitly told "what her supervisory duties were when she was first hired." But this largely reflected the lack of need for such explanations. It is otherwise uncontroverted that Aramark hired Tucker as a Kitchen Supervisor, and Tucker had previously worked as a Kitchen Supervisor.

Further, one of Tucker's co-workers, a former cook for Aramark at Benedictine College, Abel Brayshaw, testified that Tucker was hired as a Kitchen Supervisor and directed his work. Brayshaw testified that Tucker was "the boss." Another one of Tucker's co-workers and former Aramark employee at Benedictine College, Cheryl Sinclair, testified that Tucker was a Kitchen Supervisor who supervised usually eight to ten employees.

Tucker's rate of pay throughout her employment with Aramark was $14.00 per hour. During her employment, Tucker was the highest paid hourly worker for Aramark. The cooks who worked with Tucker were paid approximately $8 to $9.60 per hour. Tucker testified that she believes one of the cooks, Sean Sartain, told her that he earned around $8.00 or $8.50 per hour.

When she was first hired, Tucker typically worked the first (daytime) shift. Tucker

3

testified that she did not have any set hours; it varied based on the needs of the college from week to week. Tucker's work during 2012 was generally satisfactory.

According to Milek, at the time Tucker started she did not have the same job responsibilities as a supervisor who may have been there weeks or months, because "[w]e don't throw them into [it] the first day they start." Milek continued, "they need to get warmed up and they need to get familiar with it."

Cooking was a part of Tucker's duties as a Kitchen Supervisor with Aramark at Benedictine College.

A Kitchen Supervisor must be competent in following Aramark production guidelines. It is essential to follow Aramark's food production guidelines in order for management to maintain reasonable food costs. Production guidelines also ensure a consistent product for the customer.

Tucker testified in her deposition that the

production papers for each shift, for each meal, is a preset menu that describes a forecast of what Aramark may have projected for breakfast students, lunch students that might come in, or dinner students; and the production sheets would tell me as a cook, [sic] the other cooks, approximately how many pieces or portions of food item to prepare for that particular menu.

The production papers would tell the cooks what to make and the approximate quantity.

When Tucker started at the Benedictine position, she was learning the kitchen and becoming acquainted with the employees, but her main focus was on following the production sheets and Kamine's production guidelines. Tucker testified that, when she got to the second shift, she was also responsible for ensuring that others were following the production papers and preparing things according to them.

Milek testified that following production, recipes, and menu are requirements for everyone in the kitchen, including supervisors and cooks.

Tucker testified that, "even though my production sheet forecasted 425 pieces, I would — and I eventually learned that I have to prepare more than what that production

sheet told me to prepare so that I would have meat, additional meat ready, that you had out to batch-cook, so that I did not run out of meat." Tucker also testified that she could look at the production sheet, but based on her own personal experience, she may adjust it slightly.

During her employment Kamine coached her about the importance of following the production sheets and recipes for the menu.

Aramark's general practice is to conduct monthly "quality assurance assessments," or audits, of the Benedictine College account in a variety of areas to ensure that company standards are met.

Milek testified that the Benedictine cafeteria failed assessments in October and November 2012. There was no audit in December 2012 because the cafeteria was open for less than 15 days that month. The January audit became critical, and the staff felt pressure to perform. Milek testified, "I mean our jobs were on the line. We're going to fail – we're going to pass this assessment or there's going to be disciplinary action from up above."

According to Tucker, on December 11, 2012, she heard Sinclair tell Kamine that Andrew Holle had just said something to her that she found offensive. Holle reportedly told Sinclair, "I'll do anything for you at any time, baby," and offered to give her a back rub.

Kamine did not report this statement to Milek or to anyone else in management. According to Sinclair, Kamine laughed at her complaint.

Tucker testified that Sinclair later told Milek, "I have a piece of paper that Andrew [Holle] had given me a few days prior to December the 11th." Sinclair told Tucker that the note said something to the effect of "call me at any time for a massage," and had Holle's name and phone number on it.

December 11 was the last day before the 2012 holiday break. Most employees are laid off during the break.

Tucker believed that Kamine was not taking the Holle situation seriously. On December 14, she called Aramark's Human Resources department in Downers Grove, Illinois, and spoke with HR Assistant Teresa Triplett. Tucker did not give her name, but said  she was the daytime kitchen supervisor at Benedictine.

Tucker told Triplett that Holle had been sexually harassing Sinclair, and repeated the "I'll do anything for you at any time, baby" comment. Triplett told the plaintiff that she would talk to HR Director Jason Leffel.

Triplett contacted Milek over the winter break, and told her there was an anonymous complaint about what happened between Holle to Sinclair. Milek then called Leffel, who told her to talk with Sinclair and find out what happened.

\       Sinclair was laid off over the break, but went in to pick up her paycheck. Milek spoke her privately. Milek told Sinclair about what she had heard from Triplett, and she wanted Sinclair's side of the story.

Sinclair said that Holle had said things like, "baby, I will do anything for you, even give a back rub." She also said that Holle had given her his phone number. Milek told Sinclair that she was going to talk to Holle, and that she was not going to tolerate harassment.

However, Sinclair does not know if Milek actually spoke to Holle. Shortly afterwards, a family member of Holle's called Aramark to say that Holle had threatened to commit suicide and that he was taken to a hospital. Sinclair later gave Holle's note to Milek.

On January 13, 2013, Milek e-mailed Triplett and Aramark District Manager Shane Cravens, noting her earlier contact with Triplett, and that Holle had not returned to work based on his hospitalization.

Triplett responded two days later, stating that they needed to suspend Holle with pay until they had an opportunity to look into the allegations and talk to him. Triplett

6

asked that Milek take care of that tactfully, understanding that Holle might be rather fragile. [1]

Tucker testified that the first day back at work for most employees after holiday break was on or around January 11, 2013.

After the holiday break, a co-worker told Tucker that Holle was a registered sex offender, and that Holle had been in a mental hospital over the break after he attempted to kill himself. Between January 11th and 22nd, Tucker and her co-workers spoke about the Sinclair-Holle situation on a daily basis.

After December 11, 2012, Holle did not work for Aramark, although he did come into the cafeteria. Tucker testified that after returning from the holiday break, she saw him "walking through" the kitchen, but she never saw him work in the area. Tucker knew that Holle had some relatives working in the dishroom, an uncle named Keith and a cousin, Rusty. Although she saw Holle come to the kitchen in January, she did not work any shifts with him.

Sinclair testified that she understood Kamine had told Holle not to come back to Aramark, and that they would call him when he could come back to work. Tucker testified that, "myself and others would see Andrew walking through, [and] I might question myself: Has anything been done since I reported the first incident? Has anything been done since I reported the second incident?"

However, Tucker did not check to determine whether Holle had been terminated. Rather, she felt that Milek or Kamine should have approached her with respect to what had been done about the complaint. Holle's name appeared on the work schedule in January. Milek testified she did not remove Holle from the schedule because she thought doing so

---

[1] Milek quickly suspended Holle, although she also spoke to him to get his side of the story. Milek suspended Holle on the same day she heard from Triplett about the report. Milek did not interview Tucker as part of the investigation. At some point between January 15 and January 21, Milek told Holle he was suspended. She met with him again on January 21, 2013, and told him his employment was terminated.

would draw more attention to the investigation and his ultimate termination. According to Sinclair, Milek told her that Holle was still on the schedule because he was still employed.

As noted earlier, a new audit was scheduled in January. Milek and Kamine believed that Kamine had too many duties to focus appropriately on the items essential to passing the audit. Kamine was also already working around 80 hours a week and could not take on more.

Milek testified that the action plan was made not just for Tucker but for all of the supervisors because Kamine needed to delegate responsibilities.

On December 28, 2012, Milek emailed Kamine discussing work for Tucker. She wrote:

> She is not performing where she needs to be. This is not all her fault, but predominately ours for not managing her. Please set clear objectives for her. She's not simply a worker, she needs to be supervising. I need your help here. We hired her to be your assistant, basically, and I'm not seeing it happening.

Milek also told Kamine, "you need to delegate to her set responsibilities. Then we have a plan and something solid to base a performance evaluation on."

The January action plan was not made specifically for Tucker, but for all the kitchen staff, and "[i]t had to be because my chef manager needed to delegate out responsibilities to ensure that we were all on board and that we all scored a passing score in our next QA assessment."

Milek testified that Tucker

> was responsible for some very critical items. These are very critical, worth a lot of points on our assessment. Recipe use and accuracy, 'must make sure recipes and adherence is being followed each shift.' That's Yancy or Candy. So when Yancy is not there, its Candy's responsibility. And the production sheets being complete, that was one of our hugest problems that we were held accountable for. These are – they're all very critical items.

The plaintiff testified that after the audit, "we were instructed to take more accurate numbers on our production sheets."

8

The remaining events relevant to the lawsuit occurred during early 2013. Milek scheduled a meeting for January 3, 2013, with all supervisors and managers. Milek felt that this was a very important meeting that all supervisors and managers needed to attend. This kind of meeting only happens once every school year. The meeting included Milek, Kamine, Helen Reynolds, Marlene Norris, Jennifer Reeves, a catering supervisor named Maggie, a catering lead named Kat, and a new employee, Dante Stringfellow.

Milek expected Tucker to attend the entire meeting because she was a supervisor and because it was critical meeting. Tucker came to the January 3, 2013, meeting but left early, at about 1:00 p.m., because of a personal matter. She did not inform Milek that she would be unable to attend the entire meeting until she arrived that morning. The meeting addressed general topics as far as budget goals for Aramark, the potential upcoming audit, and other matters.  No other supervisor or manager left early or failed to attend the meeting.

Tucker testified that Milek gave no indication, prior to the start of the meeting, that it was going to be five hours long. She testified she needed to leave the meeting to care for her mother.

Milek believed that Tucker did not think the meeting was important. On January 10, 2013, she documented to Kamine in an email everything that Tucker had missed out on in the meeting.

Seeing Holle's name on the schedule, without speaking to Milek, Tucker called HR again on January 14, 2013. She again gave her title, shift and work location, but not her name. Tucker told Triplett that nothing had been done about Holle. She said that she had heard about Holle's hospitalization and sex offender status.

Triplett later told Milek that she had heard from an anonymous caller that Holle was a registered sex offender. After the second telephone call, Tucker still did not speak to Milek. Although this call was "anonymous," both Milek and Kamine understood that

9

Tucker made the report.

On January 17, 2013, Kamine sat down with Tucker and advised her that she should not have missed the January 3 supervisors' meeting without prior notification. Milek testified that Tucker was not doing the parts of her job that they had asked her to do thus far, and this was part of the reason she prepared a corrective action form for Tucker. Tucker disputes the accuracy of the write-up, but she signed the form during the meeting. The form included a short action plan with objectives just for Tucker, made by Kamine.

A week after her second call to Triplett, on January 22, 2013, Tucker called the office of the President of Benedictine University and reported that Aramark had an employee who was a registered sex offender. Tucker admitted in her deposition that, prior to her call, she had never asked Aramark management about whether Holle's employment had been terminated. She did not ask because

> it didn't affect my job, it didn't affect my hours, it didn't affect my pay if he was working or not. As long as – as long as I did my job, I wasn't concerned whether he came in or not.

Tucker met with Milek and Kamine on February 4, and discussed performance deficiencies identified in the form. Tucker was written up for not following the recipe, not following production and the menu, closing down the sandwich station, and because she did not look at the schedule and the placement sheet.

Milek noted on the form that Tucker was "laughing, shaking head" during the meeting. and made a "greater than" sign between Tucker's name and "Candice behavior." Milek testified that in the form she was writing down what was going on when Milek and Kamine were trying to talk with Tucker.

In her Response, Tucker argues she was not "laughing or snickering" during the meeting. Her deposition testimony, however, is more limited. Asked if she shook her head in response to Milek's comments, Tucker testified that she could not recall. Asked if she laughed or snickered, she replied "[n]ot during conversation," but acknowledged, "There

may have been little statements made from Yancy that might have made me laugh or try to hold back laughter or watching his facial expressions."

Tucker acknowledged during her deposition that the general conversation was to the effect that she was not living up to their expectations as a supervisor, that she had not been acting like a supervisor, and that she had not been supervising like a supervisor. Tucker testified that she told Milek and Kamine, "you've expected me to be a supervisor from my first day on the job, I came in and was put as a cook and every day since that first day on the job, until – up until this time, my time was spent cooking." She testified that Milek told her, "You know what your job responsibilities have been," and she responded, "No, that what I could see, I have been a cook."

Tucker was acting as a worker and not a supervisor. Milek recognized that the fault for Tucker's performance partly lay with her supervisors, including Milek, and "we needed to manage that." Milek decided to give Tucker a written job description.

Thus, at the February meeting, Milek and Kamine gave Tucker a two-paged typed sheet that showed general job responsibilities of a kitchen supervisor, which she read. It is uncontroverted that every responsibility on the job description is a responsibility she has had in the past with Aramark or other companies that she worked for.

Milek and Kamine delegated to supervisors, including Tucker, from the chart that had been created after the January 3 meeting. Tucker was not the only person subject to an action plan in January. But it is uncontroverted that Tucker was included in an action plan, and the parts of the action plan that Tucker was responsible for were critical items.

Milek testified that she coached Tucker during their conversation on February 4, 2013, and recorded that coaching on a different discipline notice form which was she dated and signed the next day. Milek testified that this was not a write-up, just a coaching. Milek further testified, "I informed her — this is a coaching. I'm informing her that if anybody is working off the clock, they shouldn't be, and it's against company policy."

11

In her Response, the plaintiff asserts that Milek did not tell Tucker not to work off the clock. She also seeks to controvert the contention that the February conversation was a coaching, noting that the form Milek used to record the incident is a disciplinary notice.

The cited deposition testimony, however, is equivocal. Tucker has testified that she could not recall Milek telling her that working off the clock was inappropriate or unacceptable. Further, the Aramark form used by Milek is not restricted to disciplinary actions. The form is explicitly titled "Employment Action/Disciplinary Notice Form." When Miller wrote out the form, she explicitly wrote the word "Coaching" across it.

Under the Brief Summary portion of the form, Milek wrote that Tucker had indicated another worker had been working off the clock at the beginning of the first shift.

> I asked her how she knew this was going on since she is not scheduled until 7 am or 8am and Candy responded, "I just know." I informed her that IF anyone is working off the clock they shouldn't be and that it is against company policy. She nodded that she understood [sic].

In the spring, it is common that there is a seasonal slowdown of business. By then, students' meal plan accounts are running low, and in general they spend less money in the cafeteria. Aramark's food service employees' hours were reduced in the spring of 2013 based on the declining seasonal business needs.[2]

The day after the February meeting, Milek and Kamine changed the supervisors' schedules based on what they believed would help ensure supervisory coverage at all dining locations given the changing needs. Milek also believed that appropriate supervisor coverage was essential to continuing to improve on audit.

The previous night-time kitchen supervisor was shifted to front-of-the-house

---

[2] In the ordinary course of business, Aramark kept computer records of the schedules for the cafeteria. These records also list the "Location total time" for a particular week, which is the total number of hours scheduled for the Café Kitchen during that week. For example, for the week of October 18-24, 2012, the "location total time" for the Café Kitchen was 781:00 total hours. For the week of February 21-27, 2013, the "location total time" was 595:45 total hours. In addition, the cafeteria was closed during the Spring Break holiday from March 2 to 9, 2013.

manager. Marline Norris, previously the manager of a satellite dining location separate from the cafeteria, was moved to daytime kitchen supervisor. A new employee became the manager of the satellite dining location. Tucker was moved to night-time kitchen supervisor.

Tucker asked if she and another supervisor could take turns on the second shift. Kamine refused. Tucker has admitted that she has no knowledge of the decision making process for her transfer to second shift.

When Tucker was hired, she filled out an availability sheet, which instructs, "Please let us know when you are available daily to work. If you don't list anything we will consider this open availability." Tucker wrote in "Open All Days."

In her Response to the summary judgment motion, the plaintiff states that by this she meant that she was only "willing to work during the 'day,' not evenings." (Dkt. 40, at 29). The cited deposition testimony does not really support the suggestion that Tucker was *unwilling* to work evenings. Rather, Tucker testified that by me saying "'all days,' ... I *preferred* 6:00 a.m. to 2:00 p.m. or 4:00 p.m." (Emphasis added). Tucker acknowledged the obvious interpretation of her notation, and that "I should have been more precise in my statement."

It is uncontroverted that Tucker was still eligible for overtime after she was transferred to the second-shift. Her title, rate of pay, and benefits stayed the same after she was transferred to second shift.

Tucker stated in her deposition on the second shift her weekly hours were reduced to 22 to 25. Aramark's schedules show that after February 1, Tucker was scheduled for at least 32 and up to 40 hours a week during non-holiday weeks.

Tucker also testified that, when she was placed on the second shift,

> I started as, well, what we call a floater. I might be a cook, the main cook on one evening, but then the other four days of my shift, one night I would be grill cook, one night I would be salads, one night I would be pizza, one night

I would be sandwiches.

The uncontroverted evidence otherwise establishes however, that these were Tucker's not *only* responsibilities, which also included scheduling and production paperwork.

One of Tucker's co-workers, Billy Stewart, viewed the move to the second shift as a demotion.

Tucker testified that after the February 4 meeting, there were more one-on-one counseling sessions between her and Kamine. During these meetings, Kamine

> would be standing in the kitchen among all the other employees, and he would approach me and tell me what I wasn't doing right. It — you know, and most of the time it pertained to production sheets. It was never anything else. It was this or that that I should be doing on production sheets.

She further testified that Milek was present "whenever the conversation led to me not having the time management skills that I needed to continue as a supervisor." She testified that she had been singled out almost on a daily basis for her lack of job performance since coming back, starting after the Christmas break in January.

Pursuant to her job description, Tucker was supposed to create the second shift schedules.. It is uncontroverted that Milek expected Tucker to be creating schedules as of February 1, 2013, based on the action plan.[3]

In her deposition, Tucker could not recall Milek or Kamine explicitly saying she needed to do the scheduling. She does acknowledge that, at some time prior to a planned

---

[3] Tucker attempts to controvert this fact by noting that in the spring of 2013, other employees were also subject to action plans, and cites her deposition testimony to the effect that Kamine "only asked [her] to create a schedule once," and asserts that the written job description is equivocal. These facts are insufficient to create a factual controversy.

The fact that other workers may also have been subject to an action plan does not relieve Tucker of her responsibilities. Tucker's deposition testimony is again equivocal. Asked if Kamine counseled her on the timeliness of schedules, Tucker responded "I don't recall," and then explained that after turning in her one and only schedule, Kamine did not say "Oh, it's too late." Finally, plaintiff seeks to shift the burden of scheduling onto Milek, by noting that the job descriptions states that as a supervisor she was "[r]esponsible for assisting management in all paperwork ... including schedules." But uncontroverted evidence otherwise establishes that Milek expected Tucker to do the second shift scheduling, and that Tucker knew this "[p]rior to" March 13.

14

meeting on March 13, she was told she needed to meet with Kamine to see how Kamine set such schedules. When Tucker told Milek that she could not attend the meeting because it was her day off, Kamine sent samples of the schedules to her.

Tucker prepared a schedule for the kitchen for the first time in March 2013. This was the only time she prepared a schedule.

It is uncontroverted that Milek and Kamine believed that Tucker was not communicating with them.

Milek wrote out a disciplinary notice form, which she placed in Tucker's personnel file, describing an incident on February 13. Milek wrote:

> Chef Manager, Yancy Kamine, got informed while I was off work that there was an incident in the kitchen with Candice Tucker and other employees. It was reported to me from one of our associate [sic] Helen Reynolds nighttime supervisor that an argument broke out in the kitchen. I heard that throughout the night Candice had incidents with Geoffrey Bowden, Billy Stewart and Abel Brayshaw, and Helen Reynolds had to come into the kitchen to calm the situation down.

She wrote that Brayshaw and Billy Stewart "both came to me [sic] their next shift and said it was due to the way she talks to them," and that Brayshaw said that Tucker was "riding my ass." According to Milek, it was her understanding that the fighting was between Tucker and Brayshaw, Stewart, and Bowden, that they were fighting back and forth. Because the night shift is the busiest shift, Milek was concerned customers heard the fight.

Tucker notes that Brayshaw admitted using profanity during the fight. In his deposition, Brayshaw states that he told Milek that he had "cussed at everybody last night." Brayshaw testified that he gives Reynolds "a lot of respect," because "she knows how when I get mad and she really tries to be there to calm me down." Brayshaw testified that "it wasn't just Ms. Tucker I was yelling at, it was everybody in the kitchen." Brayshaw stated that Tucker was polite and never yelled at him.

Tucker admits that she has no idea what Reynolds told Kamine about the incident. Tucker testified that during this incident, cook Brayshaw raised his voice to her, she never

raised her voice to him, and she never raised her voice to any of the employees.

Milek testified that Reynolds, Brayshaw, and Stewart came to her the next day. Reynolds reported the incident before Brayshaw. Milek testified that Tucker did not report that a fight had broken out, even though that is a supervisor's role. Milek felt, "this is huge, to have a fight break out in a college cafeteria and she didn't ever report it to us."[4]

Milek completed the write-up because Tucker should have immediately alerted her or Kamine of the incident. Milek did not give the write-up to Tucker, but issued a verbal warning on February 18. It is uncontroverted that Tucker failed to separately report the incident, and refused to accept that she should have done so:

> [I]t was as if we had to drag it out of her that there was an incident that occurred. And she described that she didn't feel that it was important. She said it was not her job ... to report something like this. And this was what the write-up was about, this is part of your job to report these things. And she didn't feel it was part of her job, and it is.

> [I]t's not that you're going to get in trouble, but it needs to be reported so we can handle it." (Milek Dep. 144:22-24).

It is undisputed that Milek and Kamine began to receive numerous complaints that Tucker was not doing her job. Cat Crossland, the catering lead, emailed Milek on February 12 stating that Tucker was not helping with documentation for the safety promo that was going on. Crossland also reported that Tucker was not helping with this when Crossland was not there on weekends and nights, and Tucker was. She stated she had asked twice for

---

[4] Plaintiff attempts to controvert this point by stressing there was no actual fighting, apparently in the sense of a physical fight, that she was polite during the incident, and that Brayshaw did not complain about her conduct. None of these points, however, refute the fact asserted by Aramark — that, as a supervisor, Tucker had a separate responsibility to notify Milek of a serious workplace incident. It is uncontroverted that one of Tucker's job responsibilities as a supervisor is to "[p]rovide coaching and performance feedback to staff members as well as disciplinary forms as needed," as well as to "[i]nform management of escalating employee conduct issues or operational issues during shifts."

Tucker's help. Assisting in meeting safety standards is a supervisor job responsibility.[5]

By Februrary 6, Tucker had begun to look for other jobs. In March, before her employment at Aramark was terminated, Tucker applied for and got a job with the Department of Defense.

On March 13, Milek and Kamine met with Tucker to inform her that they had not seen improvement in her performance, and that she needed to demonstrate immediate improvement over the next two weeks.

In the Disciplinary Notice Form dated March 13, Milek stated that there were many areas where Tucker was lacking, including not managing the kitchen schedule, the dish room schedule, reporting to anyone in management, and engagement with the kitchen team and management.

Tucker did not agree with Milek and Kamine's assessment of her performance. Milek recorded on the form, and later testified that Tucker refused to sign the form.

Tucker testified in her deposition that she did not see the form until April, and that she did not refuse to sign the forms given her in January or February. The February 4 note contains the writing, "I'm not signing this." This was written by Kamine, and Milek acknowledged in her deposition that this would give the wrong impression to Leffel in HR, when the documents were forwarded to him.

It is undisputed that, as Tucker testified, she understood her supervisors were trying to get more "out of me, and that I continued not to show improvement, that I removed myself from them, that I was more or less hostile – hostile may not be the right word- to the kitchen employees." Milek told her that in two weeks' time, if she did not show improvement, they would determine if she would still retain employment.

---

[5] Plaintiff notes that some workers, such as Sinclair and Brayshaw, thought she was a good supervisor. This does not controvert the evidence, however, that Milek repeatedly heard complaints about Tucker.

Asked if there was any discussion during the meeting about any lack of communication in general, Tucker testified, "if anything was said, it was possibly that I didn't share any concern . . . that I didn't come and rat out a fellow employee. I felt that's what they wanted from me."

Since the two week progress update, Milek had not seen much in the way of improvement, and Kamine did not observe any changes after he coached Tucker again on food processes. Milek believed that Tucker had been given counseling on what was expected of her as a supervisor, and she had been given opportunities to improve. Milek expected Tucker not only to be willing to do the work of a supervisor, but to engage with the management team in their efforts to run the business. Milek did not believe that Tucker wanted to do the work of a supervisor or that she was engaged in this way.

On or around March 27, after Tucker had failed to improve in her performance, Milek and Kamine met with Tucker again. Milek and Kamine told Tucker that they would discuss with HR whether Tucker would still be employed with Aramark after the spring break. During that meeting, Milek told Tucker that she might be demoted to a cook or her employment may be terminated. Immediately after this meeting, Milek wrote to Jason Leffel of Aramark, giving her report of the meeting with Tucker that day. Leffel responded that at this point Tucker's employment should be terminated.

The day after meeting with Milek and Kamine, Tucker filed her initial charge with the EEOC. The EEOC conducted an intake interview with Tucker on that day. Tucker told the EEOC that she had been "written up" unfairly by Milek and Kamine several times, and that she believed this was because of her previous complaint about the harassment of Cheryl Sinclair by Andrew Holle.

Milek terminated Tucker's employment on April 2, 2013. Consistent with Aramark's practice, Tucker was not given anything in writing at the point of termination.

On April 4, Tucker wrote Milek asking for a copy of her personnel file. On April 10,

18

she signed her Charge of Discrimination, which states that "I was written up on multiple occasions for trivial matters that were never an issue before I complained; and then on April 2, 2013, I was discharged without an explanation as to why I was being discharged."

On July 30, 2013, Tucker signed an Amended Charge of Discrimination, removing "Age" as a basis of discrimination. The Amended Charge also states, among other things, "I was written up on multiple occasions. . ."

Tucker testified that she only saw one written discipline before seeing her personnel file. "I did not realize that the notes or whatever — she may have been drawing pictures. I did not know at the time that whatever was being done would come back later as a verbal warning on an Aramark sheet."

Tucker notes that Kamine did not immediately report what he heard about Holle's comment to Sinclair, and argues that Kamine's failure to separately report the incident was a violation of Aramark's sexual harassment policy. The evidence does not show that Kamine never reported the incident to management, but only that he did so "[a]t some point in time."

In her Response to the summary judgment motion, Tucker notes that Kamine was not disciplined for failing to report the Holle incident, and that Brayshaw and Steward were not disciplined over their actions during the February 13th incident.

She also notes that Candice Sinclair was terminated on January 27, 2014 (nearly two years after Tucker's termination), for clocking out later. At the time of her termination, Aramark stated that Tucker had ten write-ups for clocking out late. Sinclair testified that prior to her termination she was not warned about clocking out late, or otherwise informed of the writeups. She did acknowledge in her deposition that Milek "pretty well talked to everybody about clocking out early – or clocking in early or clocking out late."

Tucker also notes that, while Milek stated in her deposition that she did not know Tucker called HR about Holle, Kamine emailed her on January 14, and indicated his belief

19

that it was Tucker who had made the report. Milek acknowledged she understood that Tucker had made the call about Holle to the Benedictine College administration.

### Conclusions of Law

Conceding, for the purposes of summary judgment, that Tucker's reporting of the Holle incident was activity protected under Title VII, Aramark argues that she has failed to present a prima facie case because she has failed to present evidence showing that the report caused her termination. It contends that the three and a half months between the first report (December 14, 2012) and Tucker's termination (April 2, 2012) is too large a gap to create any inference of causation. According to Aramark, the only adverse job action suffered by Tucker was her termination. All the intervening events, such as the disciplinary write ups and Tucker's placement on the night shift are not materially adverse job actions. Finally, Aramark argues that even if Tucker had presented a prima facie case of retaliation, Tucker's poor job performance was a legitimate and nonpretextual basis for her termination. *See Kelley v. Goodyear Tire & Rubber Co.,* 220 F.3d 1174, 1177–78 (10th Cir. 2000) (court analyzes proffered rationale based on perceptions of management); *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2003) (the court should not "act as a super personnel department that second guesses employers' business judgments").

The parties do not dispute the relevant standard of review under which the court assesses claims for retaliation under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). *See Daniels v. United Parcel Serv.*, 701 F.3d 620, 638 (10th Cir. 2012). Tucker, however, does argue at length (Dkt. 40, at 61-64) that Aramark has employed the wrong legal standard for determining whether particular job events were materially adverse for purposes of a retaliation claim, stressing the Supreme Court's recognition in *Burlington N. & Sante Fe Ry. v. White*, 126 S.Ct. 2405,

2415 (2006) that the standard for "materially adverse" job actions in retaliation cases is less than that required in discrimination cases. Thus, the definition of a "materially adverse" job action "for retaliation is broader than an adverse action for discrimination purposes." *Jones v. McHugh*, No. 12-2681-DDC, 2014 WL 3107996, *4 (D. Kan. 2014).

In *Daniels*, 701 F.3d 620, 635, the court recognized the distinct standard for review applicable to retaliation claims:

> To be materially adverse, an action must be sufficient to "dissuade [ ] a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68, 126 S.Ct. 2405 (internal citation omitted). This requires injury rising to a "level of seriousness." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir.2007) (internal quotation omitted). While the employer's conduct need not affect the terms and conditions of employment, *White*, 548 U.S. at 64, 126 S.Ct. 2405, the inquiry is an objective one, and not based on a "plaintiff's personal feelings." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir.2009) (*Semsroth II* ).

According to Aramark, the writeups cannot be adverse job actions because they were not made public and Tucker was not actually demoted. Her job title, it emphasizes, remained the same. And, citing the holdings in *Daniels* and *McGowan v. City of Eufala*, 472 F.3d 736, 742–43 (10th Cir. 2006), it argues that the transfer to the night shift cannot constitute a materially adverse job action.

The court disagrees. A rational fact-finder could conclude that the disciplinary write ups were an integral part of the process that directly led to Tucker's termination. Such a large number of write-ups and warnings, in a relatively short period of time, for a worker who had previously been free of such discipline, could well serve as a deterrent to a reasonable worker from acting on his or her right to report employment discrimination. The court notes that, in an email exchange on March 13, 2013, just weeks before Tucker's termination, Milek and Jason Leffel explicitly referenced and noted the existence of the January and February disciplinary notes.

The same is true of Tucker's transfer to the night shift. *Daniels* and *McGowan* are distinguishable. In the former, the court wrote that

> we cannot conclude Daniels suffered an adverse employment action when she was assigned to the night window. Daniels's job classification did not change when she was assigned to the night window, nor was her salary decreased. Although she claims she did not like working the night window, that preference is different from showing her assignment was an objective demotion. And though dispatchers working the different windows had different duties, Daniels did not introduce any evidence showing the dispatch duties differed significantly. In addition, the record shows Daniels spent a good deal of her time as cover dispatcher actually working the night window, including most of the year before her assignment to that shift was made permanent. Thus, when Daniels was permanently assigned to the night window in July 2008, her duties did not actually change in a material way.

701 F.3d at 636.

Notably, the court reached this conclusion in the course of its discussion of Daniels's discrimination claim. The plaintiff there asserted that her assignment to the night shift in 2006 was the result of gender discrimination. Her retaliation claim was not predicated on this transfer, but on other events which began in late 2008. The remainder of the court's discussion makes this clear:

> We acknowledge that many employees would find working the day shift preferable to the night shift. But this does not establish an assignment to the night shift is sufficiently material to constitute a *significant* change in employment status or responsibilities. In *McGowan v. City of Eufala*, 472 F.3d 736, 742–43 (10th Cir.2006), we discussed an employee's claim that her employer's denial of a transfer to the day shift was a materially adverse employment action. We reasoned that the shifts "offered no differences in pay and benefits, nor was the night shift more arduous" and found the employee desired the transfer "purely for personal reasons." *Id.* at 743. We concluded the denial was not material.

*Id.*

Accordingly, *Daniels* does not directly support the proposition that a shift change is not materially adverse job action for purposes of a retaliatory discharge claim.

*McGowan* was a retaliation case, but there the court did not hold that a change to a night shift *cannot* be a materially adverse job action, only that, under the particular facts of that case, a refusal to transfer the plaintiff already working the night shift to a day shift did not meet this standard. The court wrote:

> The question, then, in the wake of *Burlington Northern*, is whether a reasonable person would be deterred from making or supporting a

22

discrimination claim if she knew she would be *denied a shift change*. Here, the answer is no, because on this record the claim fails the test of materiality. While McGowan may have desired a change in shift, she identified no specific rationale for the transfer other than an undefined subjective preference for the change. In fact, the shifts offered no differences in pay and benefits, *nor was the night shift more arduous*. Although claiming it to be a better assignment, her stated desire for change was purely for personal reasons. Moreover, before Lollis filed his claim, *Day had refused to transfer her to the day shift because she lacked the necessary administrative skills*. Finally, the record does not indicate that McGowan was permanently denied a shift change. The City's legal counsel advised that the status quo be maintained during the pendency of Lollis's lawsuit, which settled several months after McGowan requested the change. *Nothing in the record suggest that McGowan requested a shift change* or that one was denied after Lollis's suit settled.

472 F.3d at 742-43. *See also Tadlock v. Lahood*, 550 Fed.Appx. 541, 544-45 (10th Cir. 2012) (affirming district court ruling that denial of shift change request was not a materially adverse employment action since "it did not affect Tadlock's job status, there was no objective evidence of material disadvantage, and the change was only subjectively preferred").[6]

The added emphasis shows how this case is distinct from *McGowan* and *Tadlock*. Tucker was not denied a change of shift to the day, she was forced to transfer to the night shift. The night shift at the college cafeteria was busier than the day shift, and therefore the work was likely more arduous. There is evidence that Tucker needed to provide medical care for her mother, and that employees viewed the transfer to the night shift as a demotion. There is no indication that the transfer was provisional or temporary. The evidence shows that Tucker asked for relief from the shift change and was refused.

---

[6] Other decisions have found that shift changes are not materially adverse changes under the particular circumstances of those cases. *See Langebach v. Wal-Mart Stores*, 716 F.3d 792, 799-800 (7th Cir. 2014) (transfer to night shift not a materially adverse where evidence failed to show plaintiff asked for any accommodation); *Porter v. City of Chicago*, 700 F.3d 944, 955 (7th Cir. 2012) (finding that transfer to weekend shift not materially averse, despite plaintiff's contention that it prevented her from attending church, given evidence defendant attempted to accommodate her and in any event "the undisputed evidence" demonstrated plaintiff sought weekends "not to attend church," but for other reasons); *Tepperwien v. Energy Nuclear Operations*, 663 F.3d 556, 572 (2nd Cir. 2011) ("the switch to the night shift was not materially adverse because, as his own testimony makes clear, Tepperwien requested it").

A rational fact-finder could review the events occurring during January and February, 2013, and determine that Tucker suffered job actions in close temporal proximity of her reporting of an incident of sexual harassment. Aramark is able to magnify the temporal gap to three and a half months only by looking at the very first event (Tucker's first call to HR), and the last (her termination). Whether the intervening shift change and disciplinary write-ups considered are independent materially adverse job actions, or as a sequence of events integrally connected to Tucker's termination, a rational fact-finder could conclude that Tucker's reports to HR and to the college administration caused retaliation against her.

As noted earlier, Aramark argues that even if Tucker presented a prima facie case of retaliation, it is entitled to summary judgment because it had a legitimate reason to terminate her, given her poor performance as a supervisor. The cafeteria needed to improve performance in light of the recent audits, and Milek and Kamine were concerned about how Tucker conducted herself as a supervisor.

Nor, Aramark contends, is there any reason to view this concern as a pretext for retaliation. Pretext exists where a rational fact-finder could refuse to credit the employer's proffered rationale based upon "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

The evidence shows Aramark was receptive to complaints of sexual harassment. Holle's employment was immediately suspended after Tucker's December report. Although Milek kept Holle on the schedule to avoid gossip, it is uncontroverted that Holle never actually worked at the cafeteria again, and was terminated early in the spring semester. Although Tucker complains that she was not given a written copy of her job description until later, she was employed as a Kitchen Supervisor, had previously worked in that position, and was familiar with the requirements of job. Further, Aramark notes, Tucker failed in her responsibility to report the workers when the fight erupted on

24

February 18th.

According to Aramark, Milek did not consult separately with Tucker about the Holle incident because it was entirely unnecessary, given that Aramark promptly terminated Holle's employment anyway. Acknowledging that a fact dispute exists as to whether Tucker was indeed shown, and refused to sign, the 2013 write ups, Aramark stresses that she knew about their content. Finally, Aramark stresses that company policy does not absolutely mandate use of the progressive discipline policy, or the time frame in which disciplinary writeups are to be created.

Certainly, there is evidence from which a rational fact-finder could conclude that Aramark had reason to be displeased with Tucker's performance. It is uncontroverted that Milek heard complaints about Tucker's work, and given her prior experience as a Kitchen Supervisor, the plaintiff should have known that her job responsibilities extended beyond cooking. Further, Tucker's failure to report the loud verbal fight that broke out on her shift was a violation of her responsibilities as a supervisor.

However, the same fact-finder could also determine that Tucker was a good worker with no prior history of poor performance or discipline during some ten years of employment. Although Tucker ought to have generally known of the responsibilities of a supervisor, her testimony is that during her initial employment at Benedictine, she was actually instructed or expected to act as a cook. While Tucker was disciplined for failing to report the fight, the true perpetrator of the event (Brayshaw) was not disciplined at all. Milek and Brayshaw employed disciplinary write-ups against Tucker, but contrary to their standard practice, did not do so promptly. There is a fact dispute as to whether any of the write-ups were shown to Tucker. In one instance, one of Tucker's supervisors wrote "I'm not signing this," misleadingly suggesting that Tucker did so. Given all the facts, the court finds that the defendant's motion should be denied.

25

IT IS ACCORDINGLY ORDERED this 5th day of January, 2015, that the defendant's Motion for Summary Judgment (Dkt. 36) is hereby denied.


 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE